IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 1, 2016

## IN RE CASEY C., ET AL.

**Appeal from the Juvenile Court for Montgomery County**
**No. 15-316, 15-317, 15-318      Tim Barnes, Judge**
_____

**No. M2016-01344-COA-R3-PT – Filed December 19, 2016**
_____

This is a termination of parental rights case.  Mother/Appellant appeals the termination of her parental rights to three minor children on the grounds of: (1) abandonment by failure to provide a suitable home; (2) abandonment by willful failure to support; and (3) persistence of the conditions that led to the children's removal from Appellant's custody. The trial court also found, by clear and convincing evidence, that termination of Appellant's parental rights is in the children's best interests.  Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and W. NEAL MCBRAYER, J., joined.

Gregory D. Smith, Clarksville, Tennessee, for the appellant, Lisa C.

Herbert H. Slatery, III, Attorney General and Reporter; and Alexander S. Rieger, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I. Background

The three minor children at issue in this case were born to Lisa C. ("Mother" or

"Appellant") and Chad C. ("Father").[1] Casey C. was born in July of 2004;[2] Corey C. was born in December of 2006, and Leaya C. (together with Casey C. and Corey C., the "Children") was born in July of 2008.

On or about October 28, 2010, DCS received a referral alleging environmental neglect. On October 28, 2010, Child Protective Services ("CPS") visited the home and found that the family had no electricity and inadequate food. On November 1, 2010, DCS filed a petition for temporary legal custody and removal of the Children based on allegations of drug exposure and environmental neglect. In its petition, DCS specifically averred that both parents were "on drugs using crack. The family's electricity is cut off. . . . The parents have been asking for food and food stamps." On the same day, the trial court entered a protective custody order removing the Children from the home and awarding temporary custody to DCS.

On July 16, 2012, *nunc pro tunc* to October 27, 2011, DCS filed a notice and motion for trial home visit seeking a trial home visit between Mother, Father and the Children. The trial court granted the motion and approved a ninety-day trial home visit. On January 19, 2012, the trial court entered an order stating that the trial home visit would self-execute on January 25, 2012, when complete care, custody and control of the Children would be restored to Mother and Father. Unfortunately, the trial home visit did not lead to reunification.

On July 19, 2013, DCS filed a petition for dependency and neglect and sought a protective order prohibiting Mother from allowing the Children contact with the Father. In its dependency and neglect petition, DCS alleged, in relevant part, that, on July 13, 2013, DCS had contacted Mother by phone in furtherance of its investigation. The CPS investigator noted that Mother "was slurring her words, and was unable to answer [the CPS investigator's] questions." Based on the phone conversation, CPS proceeded to a home visit. CPS investigators reported that, during the home visit, they "observed that [Mother] was clearly intoxicated. [Mother] continued to have slurred speech and was not able to maintain balance." CPS investigators further observed that Mother "was not able to walk through the home without using the walls and furniture to prevent her from falling." CPS investigators asked Mother about her intoxicated condition, and Mother replied that "she had two drinks today and that was all." CPS investigators also asked whether Mother had taken any prescription medication, to which she replied that "she had

---

[1] Father's parental rights were terminated by order of April 4, 2016. He did not appeal.

[2] In cases involving minor children, it is the policy of this Court to redact the parties' names so as to protect their identities.

not taken any of her pain medication today."[3]  However, when CPS investigators performed a pill count, they observed that Mother

> provided CPS [investigators] with three medications Hydrocodone, Carisoprorol, and Alprazolam.  All three of the prescriptions were filled on July 12, 2013 and there were 56 pills provided for each prescription.  The instructions on each were to take four pills per day.  CPS [investigators] . . . noted that there were seven Carisoprorol left in the bottle, which indicates that 49 pills were taken within the previous four days.  CPS [investigators] observed the prescription of Hydrocodone, there were 34 pills remaining in the bottle.  If taken as prescribed, there should have been 40 pills remaining in the bottle.  CPS [investigators] observed the Alprazolam prescription; there were 50 remaining which indicates that [Mother] has taken less than prescribed.

Mother explained the prescription discrepancy by stating that Father had "broken into the family home and stole[n] her medication."

In response to DCS's petition for dependency and neglect, Mother agreed to sign an immediate protection agreement, allowing the Children to temporarily reside with Samuel R., who was the pastor of Mother's church and a registered foster parent.  In light of this agreement, DCS did not immediately move forward with its dependency and neglect / custody petition.  However, in the fall of 2013, Mr. R. notified DCS that he and his wife could no longer financially support the Children.  Because Mr. R. could only be compensated for foster care if the Children were in State custody, on September 26, 2013, the trial court entered a protective custody order removing the Children from Mother's custody and placing temporary custody with DCS.  On November 26, 2013, the trial court entered an order adjudicating the Children to be dependent and neglected.  The trial court specifically found that "the [C]hildren are dependent and neglected within the meaning of the statute base[d] on Mother's continued drug and alcohol use within the home."

On January 26, 2015, DCS filed a petition to terminate Mother's parental rights.  As grounds for termination, DCS averred: (1) abandonment by willful failure to support the Children; (2) abandonment by failure to provide a suitable home after reasonable efforts by DCS; (3) abandonment by willful failure to visit the Children; and (4) persistence of the conditions that led to the Children's removal from Mother's home.  DCS also averred that termination of Mother's parental rights was in the Children's best

---

[3] In 2009, Mother was involved in a car wreck that left her in a coma for six weeks.  Mother testified that she is in constant pain and has trouble with her short-term memory.

interests. By separate orders, which were both entered on March 3, 2015, the trial court appointed a guardian ad litem to represent the Children and appointed an attorney for Mother. By order of August 20, 2015, a new attorney was appointed to represent Mother, and the case was continued to allow Mother's new attorney time to prepare for the hearing on DCS's petition to terminate parental rights.

The trial court heard the petition to terminate parental rights on December 1 and 7, 2015. By order of April 4, 2016, the trial court found that there was clear and convincing evidence that Mother's parental rights to the Children should be terminated on the grounds of: (1) abandonment by willful failure to support; (2) abandonment by failure to provide a suitable home; and (3) persistence of the conditions that led to the Children's removal from Appellant's custody. The trial court also found, by clear and convincing evidence, that it was in the children's best interest that Mother's parental rights be terminated. Mother appeals.

## II. Issue

The sole issue for review is whether the trial court erred in terminating Mother's parental rights.

## III. Standard of Review

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only when a compelling interest exists. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the children's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Accordingly, both the grounds for termination and that termination of parental rights is in the children's best

- 4 -

interests must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable ... and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id*. at 653.

In light of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review in Tennessee Rule of Appellate Procedure 13(d). As to the trial court's findings of fact, our review is de novo with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

### IV. Grounds for Termination of Mother's Parental Rights

As noted earlier, the trial court relied on the following statutory grounds in terminating Appellant's parental rights: (1) abandonment by willful failure to support, Tennessee Code Annotated Sections 36-1-113(g)(1) and 36-1-102(1)(A)(i); (2) abandonment by failure to establish a suitable home and lack of concern, Tennessee Code Annotated Sections 36-1-113(g)(1) and 36-1-102(1)(A)(ii); and (3) persistence of the conditions that led to the Children's removal, Tennessee Code Annotated Section 36-1-113(g)(3). Although only one ground must be proven by clear and convincing evidence in order to terminate a parent's rights, the Tennessee Supreme Court has instructed this Court to review every ground relied on by the trial court to terminate parental rights in order to prevent "unnecessary remands of cases." *In re Angela E.*, 303 S.W.3d 240, 251 n.14 (Tenn. 2010). Accordingly, we will review all of the foregoing grounds.

### A. Reasonable Efforts

Before addressing the specific grounds for termination of Appellant's parental rights, we note that, historically, the decision to pursue termination of parental rights on the grounds of abandonment has invoked DCS's statutory duty to make reasonable efforts to facilitate the safe return of children to the parent's home. *In re R.L.F.*, 278 S.W.3d 305, 315 (Tenn.Ct.App.2008) (citing Tenn. Code Ann. §§ 37-1-166(b), −166(a)(2), −166(g)(2)); *see also* *In re Tiffany B.*, 228 S.W.3d 148, 151, 160 (Tenn.Ct.App.2007) (vacating a finding of abandonment, substantial noncompliance, and persistence of conditions for failure to make reasonable efforts). However, in *In re Kaliyah S.*, 455

S.W.3d 533 (Tenn. 2015), the Tennessee Supreme Court specifically overruled "the holding of *In re Tiffany B.* and other cases following the holding in *In re C.M.M.* to the extent that the court required DCS to prove by clear and convincing evidence that it made reasonable efforts to reunify as a precondition to termination of parental rights (citations omitted)." *Id*. at 555 n.34. In *Kaliyah*, the Court specifically stated that

> proof of reasonable efforts is not a precondition to termination of parental rights of a respondent parent. As with other factual findings made in connection with the best interest analysis, reasonable efforts must be proven by a preponderance of the evidence, not by clear and convincing evidence. *In re Audrey S.*, 182 S.W.3d at 861. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that the termination is in the child's best interest (citations omitted).

*Id*. at 555.

Nonetheless, proof of reasonable efforts is specifically required by statute to prove the ground of abandonment by failure to provide a suitable home. Tennessee Code Annotated Section 36-1-102(1)(A)(ii)'s definition of abandonment requires DCS to make reasonable efforts to assist the parents to establish a suitable home. The statute focuses on the four month period following removal of the children from the parent's custody. In its order terminating Mother's parental rights, the trial court outlined the various efforts DCS made to assist Mother in fulfilling her obligations under the permanency plans and concluded that, during the relevant time period, "DCS made reasonable efforts to assist [Mother] to establish a suitable home for the children, but [Mother] has failed to make even minimal efforts to provide a suitable home for her children." Although Appellant did not raise an issue concerning the trial court's findings on DCS's reasonable efforts, because DCS's obligation to provide reasonable efforts is triggered by the trial court's reliance on the grounds of abandonment by failure to provide suitable housing, we have reviewed the record to determine whether the evidence preponderates in favor of the trial court's findings concerning DCS's reasonable efforts. Although Mother testified that DCS had provided no services or help to her, the record indicates otherwise. DCS caseworker, Joi Mosley, testified that DCS developed permanency plans for the Children. These plans set out tasks and goals that would help Mother regain custody of the Children. Mother testified that she understood her requirements under these plans. Of primary concern was Mother's lack of proper housing, her lack of income, and her continued drug use. To aid Mother in addressing these concerns, Ms. Mosely testified that DCS provided Mother with a list of employment opportunities and offered to provide her with transportation to any job interviews. DCS set up parenting classes and alcohol

and drug treatment. However, Ms. Mosley testified that, when she would attempt to contact Mother to come in for drug screenings, Mother would often not answer the call. Ms. Mosley further stated that she attempted to assist Mother with completing the necessary forms to apply for disability, but Mother would never meet with Ms. Mosley to complete the paperwork. From the entire record, and in light of the particular facts of this case, we conclude that the evidence supports the trial court's finding that DCS has made reasonable efforts to assist Mother; however, for the reasons discussed below, it does not appear that Mother has availed herself of these opportunities.

## B. Abandonment by Willful Failure to Support

Tennessee Code Annotated Section 36-1-113(g)(1) provides that termination of parental rights may be based upon the ground of "[a]bandonment by the parent or guardian, as defined in § 36-1-102...." Tennessee Code Annotated Section 36-1-102(1)(A)(i) defines abandonment, in relevant part, as follows:

> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or a guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that a parent or parents or a guardian or guardians . . . have willfully failed to . . . to support or have willfully failed to make reasonable payments toward the support of the child.

*Id.*

Failure to support a child is "willful" when a person is aware of his or her duty to . . . support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005). Willfulness depends on the actor's intent, and intent is seldom capable of direct proof. *Id*. Therefore, the trier-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct. *Id*. "Whether a parent failed to . . . support [his or her] child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d 636, 649 (Tenn. Ct. App. 2013) (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007)). Whether there is a court order, requiring a parent to support his or her child, is not dispositive because Tennessee Code Annotated Section 36-1-102(1)(H) provides that "every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children." Therefore, a parent's obligation to support his or her child exists regardless of a court order requiring the parent to pay support. *See, e.g., In re Shandajha A.G.*, No. E2012-

02579-COA-R3-PT, 2013 WL 3787594 (Tenn. Ct. App. July 17, 2013).

The relevant four-month time period in this case is September 26, 2014 until January 25, 2015. Mother testified that, during this time, she gave the Children small amounts of money, i.e., one or two dollars for use in vending machines. Mother testified that, on occasion, she would bring small toys or clothes for the Children when she participated in visitation. Concerning these items, the trial court found that:

> If the Court were to take the evidence most favorable to [M]other, according to her own testimony, it would find that she testified that she would give the children money for a book fair or science fair, no specificity as to that, but that she would occasionally give them a dollar or two . . . that she would sometimes bring snacks, that she had on occasion given them money for vending machines at DCS, and that she had taken them toys and birthday and Christmas presents in 2012. Children cannot survive on such meager support in kind, if, in fact, any of the [aforementioned] even took place.

Although the trial court does not use the term "token support" in its order, it is clear that the trial court found that the small amount of money and gifts that Mother allegedly gave to the Children was token support, which did not rise to the level of support necessary to preclude a finding a willful failure to support. As explained by the Tennessee Supreme Court,

> [t]oken support payments are not sufficient to preclude a finding of a willful failure to support. Token support is support that "under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). In the context of token support, the word "means" connotes both income and available resources for the payment of debt. *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *11 n. 24 (Tenn. Ct. App. June 3, 2003); *see also* Black's Law Dictionary 1070 (9th ed. 2009).

*In re Adoption of Angela E.*, 402 S.W.3d 636, 641 (Tenn. 2013). Here, Mother claimed that her lack of support (other than the token support mentioned above) was not willful because of the injuries she had sustained in a car accident some thirteen years prior to the date of hearing on the petition to terminate her parental rights. Although Mother testified that she is unable to work (so as to have money to provide support for the Children), in its order terminating her parental rights, the trial court specifically found that

> [t]here is absolutely no proof that was tendered to the Court that [Mother]

has actively pursued disability with the social security agency, however she testifies that she has applied ten times.

This finding is supported by the preponderance of the evidence. Although Mother stated that she had applied and been denied disability numerous times, she failed to provide any proof of her attempts. Furthermore, there is nothing in the record to show that Mother is physically or mentally unable to work. In fact, Mother was briefly employed, in the fall of 2015, at a thrift store. However, she was fired from that job for not showing up. Mother testified that she was sick and called in, but that her message did not get to her manager. In total, Mother was employed for three weeks. From the evidence, the trial court found that her failure to support the Children was willful. Specifically, the court found that there is

no evidence that this wreck that happened some 13 years ago has rendered her unable to be employed. If, in fact, she has applied for disability ten times as she testified, the Court would wonder what kind of magical thinking makes you think that the eleventh time is the charm.

The Court finds that the [M]other has not taken reasonable steps to have gainful employment, that she has during her extended period of unemployment abused drugs and has consistently tested positive for cocaine, that despite having provided only token support for her children, she smokes by her admission, some ten cigarettes [per day] and if she had provided support that the cigarettes and her cocaine cost, that would get her out of this problem of having failed to support her children. [Mother] has chosen to indulge her own habits and addiction at the expense of her relationship with her children and at the expense of her children being supported by a parent.

Mother's own testimony supports the trial court's finding:

Q [to Mother]: You also testified . . . that the fact that you don't have a job, which [according to] your testimony is the sole reason why you haven't been able to [support the Children], was not willful. But you had a job at City Thrift in October 2015; is that correct?

A. Yes, ma'am.

***

Q. Okay. So you're able to have a job. You're capable of having a job.

Yes or no?

A. No. That job, it was really hard on me.

Q. But you were capable—they hired you; correct?

A. They hired me.

Q. You worked there for three weeks; is that correct?

A. Yes, ma'am.

Q. So you were capable of working?

A. Yes.

***

Q. So you smoke a pack of cigarettes every two days; correct?

A. Yeah.

Q. How do you pay for those cigarettes?

A. My friend.

***

Q. How do you supply your cocaine habit?

A. Friends will come over. And it's not my cocaine. It's theirs.

Q. So do your friends just give you cocaine for free?

A. Yeah.

Q. How are you paying for your storage unit that your furniture is stored in?

A. My friends are—her and her husband are helping me pay that.

Q. So your friends are paying for your cigarettes, for your drugs, and for

your storage unit, but your friends haven't offered to help pay for your kids?

A. No, ma'am.

It is clear from the foregoing testimony, and the record as a whole, that Mother is able to get money for her cigarette and cocaine habits, but is unconcerned with providing any meaningful support for the Children. We conclude, therefore, that the facts, as found by the trial court, are supported by the preponderance of the evidence and clearly and convincingly establish the elements necessary to terminate Appellant's parental rights on the ground of abandonment by willful failure to support. Tenn. Code Ann. § 36-1-113(g)(1).

### C. Abandonment by Failure to Establish a Suitable Home and Lack of Concern

Tennessee Code Annotated Section 36-1-102(1)(A)(ii) further defines "abandonment" for purposes of termination of parental rights as follows:

> (ii) ... for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.

*Id.*

As discussed above, the Children were taken into DCS custody due, in part, to the sexual abuse perpetrated by Father against Leaya. The record indicates that DCS made it abundantly clear to Mother that, if she was to have contact with the Children, she could not have them around Father. Nonetheless, Mother continued to live with Father because, according to her testimony, he was her sole means of support and, without his income, she would have been homeless. As found by the trial court:

> At the beginning of this case when the children came into custody, the [M]other did not have a suitable home for them. That is one of the reasons they came into custody. The [M]other has resorted to living with the person that she knew was accused of molesting one of her children. She chose to do that because, by her own testimony, otherwise she would have been homeless. So she chose to live with this man knowing and being

- 11 -

advised that she could not have her children so long as she lived with him. She did not have sufficient income at any relevant period to provide a suitable home. And again, the Court finds no reason to find her disabled and would find this failure to provide a suitable home a willful refusal to become gainfully employed.

Although Mother testified that she had filled out several applications for housing, the trial court noted that her efforts to procure housing without first procuring employment was "some type of magical thinking." Again, Mother's unwillingness to engage in any meaningful employment negates her ability to provide a proper home for the Children. Simply put, without an income, she cannot afford housing. Accordingly, Mother has chosen to live with the person accused of abusing her child.

Not only does the record indicate that Mother has failed to provide a suitable physical abode for the Children, but (by her own admission) she also continues to use illegal drugs. From the record, it is clear that Mother's drug use has kept her from taking the necessary steps to regain custody of her Children. For example, around the time that Mother was fired from her thrift store job, she tested positive for cocaine use. It appears that her inability to maintain consistent employment and her inability to make good parenting choices is due, at least in part, to her addiction, which (as discussed below) has not been treated due to Mother's lack of participation in her own recovery.

From the record, we conclude that the facts, as found by the trial court, are supported by the preponderance of the evidence and clearly and convincingly establish the elements necessary to terminate Appellant's parental rights on the ground of abandonment by failure to provide a suitable home and lack of concern. Tenn. Code Ann. § 36-1-113(g)(1).

### D. Persistence of Conditions

Tennessee Code Annotated Section 36-1-113(g)(3) provides that termination of parental rights may be based upon persistence of conditions:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

- 12 -

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home

*Id.*; *see also* **In re S.Y.**, 121 S.W.3d 358, 369 (Tenn.Ct.App.2003). The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child*." In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn.Ct.App.2010).

In the case of **In re Audrey S**., 182 S.W.3d 838 (Tenn.Ct.App.2005), this Court held that, based upon the statutory text and its historical development, the ground of persistence of conditions found in Tennessee Code Annotated Section 36-1- 113(g)(3) provides a ground for termination of parental rights only where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse. *Id.* at 872. As discussed above, the Children were adjudicated to be dependent and neglected based on environmental neglect and Mother's continued drug use. In its order terminating her parental rights, the trial court specifically found that:

When the children came into custody, [Mother] did not have a suitable home. Today[, Mother] does not have a suitable home. When the children came into custody, [Mother] did not have employment or a legal source of income. Today, some two years later, [Mother] still does not have a legal means of income.

Two years ago, [Mother] demonstrated a problem with drugs, having tested positive for cocaine. Many times during the two years . . .[that the] children have been in foster care and as late as November 2015, [Mother] has tested positive for cocaine and [Mother], by her own admission, used cocaine three weeks ago. The conditions that led to the children coming into the custody of DCS persist unto this day and have not changed a bit over the past 26 months.

As discussed in detail above, despite DCS's efforts to assist her, Mother has failed to procure adequate housing. In fact, there is little evidence in the record concerning Mother's current living arrangement. From her testimony, however, it is clear that she

maintains regular contact with "friends" who provide her with cigarettes and drugs. Certainly, Mother's choice in "friends" does not bode well for the home environment that she would provide for her Children. More concerning, however, is the fact that Mother continues to test positive for cocaine use. As set out in context above, even in her own testimony, she does not deny that she uses cocaine. Although Mother has, on a few occasions, tested negative for drugs, the majority of the drug test results (included in the record) show positive for cocaine. DCS has assisted Mother in making contact with drug and alcohol treatment facilities; however, Mother has failed to follow through after the initial assessment. In her testimony, Mother stated that she has not been ready to address her addiction, but opines that she "just need[s] a chance, just six months so that I can go and fix myself. Just six months so that I can get the help that I need . . . ." From the record, Mother has had ample opportunity and assistance to make permanent changes that would allow the Children to be returned to her custody; however, as of the hearing date, she had not availed herself of these opportunities. Given Mother's history of noncompliance, there is little likelihood that additional time would prompt her to make a change in her circumstance. This Court has previously held that "in determining whether grounds for termination of the parental rights of a biological parent are established, both the trial court and this Court must look to the evidence of the parent's past actions, rather than the parent's future aspirations." *In re Adoption of Logan A.S*., No. W2009-02661-COA-R3-PT, 2010 WL 3984712, at \*8 (Tenn. Ct. App. Oct. 12, 2010). Based on the totality of the circumstances, we conclude that there is clear and convincing evidence in the record to support the trial court's finding that the conditions that led to the Children's removal from Mother's custody still persist, and "[t]here is little likelihood that these conditions will be remedied at an early date so that the [C]hild[ren] can be safely returned to the parent . . . in the near future." Tenn. Code Ann. § 36-1-113(g)(3)(B).

## V. Best Interests

When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit upon establishment of a ground for termination of parental rights, then "the interests of parent and child diverge." *In re Audrey S.*, 182 S.W.3d at 877. The focus shifts to the child's best interest. *Id*. Because not all parental conduct is irredeemable, "Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest." *Id*. However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d). "The child's best interest must be viewed from the child's, rather than the parent's, perspective." *White*, 171 S.W.3d 194.

- 14 -

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child. These factors include, but are not limited to:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> ***
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> * * *
>
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
>
> ***
>
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). This Court has noted that, "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877.

In its order, the trial court stated, in relevant part, that

> [t]he Court has heard the testimony of the resource parent, and would find that the children have been well situated in [Samuel R.'s] home for over eight months. They have provided very well for the needs of the children and while in their home, the children have thrived. Based on the oldest child's testimony, there is a strong bond that exists between the children and their foster family. It is also evident by the child's testimony that he believes he would be better off to be with the foster parents than to return to his mother's care. Having heard the testimony and reviewed the evidence, the Court would find by clear and convincing evidence that the termination of . . . [Mother's] parental rights would be in the children's best interest[s].

From our review, the record supports the trial court's finding that termination of Mother's parental rights is in the Children's best interests. As discussed above, despite DCS's efforts to assist her, Mother has failed to make any meaningful change to her circumstances. She continues to be unemployed. She had not found suitable housing, and she continues to use drugs. She maintains friendships with people who enable her to continue her drug habit. In addition, Mother has failed to provide anything other than token support for the Children. Although Mother has maintained minimum contact with the Children, there is no evidence that there is a meaningful relationship between Mother and the Children. Rather, the evidence shows that the Children have bonded with their foster parents. The evidence further shows that the Children have been well cared for in their current foster placement. Given the Children's ages and the lack of stability in Mother's household, we conclude that it would likely cause the Children emotional and psychological harm to be placed in Mother's custody. Accordingly, we conclude that the facts, as found by the trial court, are supported by the preponderance of the evidence and clearly and convincingly establish that termination of Mother's parental rights is in the Children's best interests.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's order, terminating Mother's parental rights to these Children. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed to the Appellant, Lisa C. Because Lisa C. is proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

_____
ARNOLD B. GOLDIN, JUDGE